J-S36035-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE MATTER OF THE TRUST ESTABLISHED UNDER THE WILL OF CLAIR S. GRAYBILL, DECEASED | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: JODY GRAYBILL | No. 1656 MDA 2015 |

Appeal from the Order Entered August 27, 2015
In the Court of Common Pleas of Juniata County
Orphans' Court at No(s): 34-00-0077

BEFORE: MUNDY, J., DUBOW, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.:                **FILED JUNE 10, 2016**

Appellant Jody Graybill, in his capacity as Trustee of the Trust established by his late grandfather, Clair S. Graybill, appeals from the order entered in the Court of Common Pleas of Juniata County, Orphans' Court division, which confirmed the auditor's report directing that various distributions be made from the Trust.[1]  After a careful review, we affirm.

The relevant facts and procedural history underlying this matter have been aptly set forth, in part, by the court-appointed auditor as follows:

_____

[1] We note this appeal is properly before us.  **See** Pa.R.A.P. 342(a)(1) ("An appeal may be taken as of right from. . .[a]n order confirming an account, or authorizing or directing a distribution from an estate or trust[.]").

*Former Justice specially assigned to the Superior Court.

By [o]rder dated October 25, 2013, the [Orphans'] Court appointed [an] auditor in this matter "to address all objections, request for accounts and outstanding legal issues."

By agreement of counsel for the [Appellant] and [Donald Graybill and Dianna Spriggle (collectively "Objectors")], the audit hearing was delayed to permit the parties to pursue liquidation of real estate assets.

The [a]uditor limited the scope of the hearing to the objections raised by [Objectors] and the Co-Executors of the Last Will of Florence M. Graybill to [Appellant's] Twelfth and Final Account with proposed distribution filed on August 13, 2013. The requests for accounts that were pending on October 25, 2013, were fulfilled and no objections were filed to those accounts.

A pre-hearing conference was held on October 1, 2014, and the [a]uditor's hearing was held [on] October 15, 2014. At the [a]uditor's hearing[,] Attorney Antonio D. Michetti, representing [Appellant], Attorney Thomas C. Clark, representing [Objectors], and Attorney Brian R. Baker, representing the Florence M. Graybill Estate, all appeared and participated in the hearing. [Appellant], [Objector] Dianna Spriggle, and Cynthia Williams, Trust Officer of Juniata Valley Bank, the surviving Co-Executor of the Last Will of Florence M. Graybill, also attended and participated in the hearing.

\*\*\*

Based on a review of the notes of testimony and the exhibits admitted at [the] hearing, the [a]uditor ma[de] the following findings:

1. [Appellant], grandson of [the late] Clair S. Graybill and Florence M. Graybill, was named as Trustee in his grandfather's Will of potentially two (2) separate trusts[.] [He] accepted that position and responsibility, and acted in the capacity of Trustee during the period [of] May 30, 2002, to and including the closing date of this Twelfth Account, July 31, 2013.

2. Florence M. Graybill was the income beneficiary of the sole trust funded by Clair's estate, and she died [on] March 11, 2013.

3. The trust principal has consisted of varying amounts of cash; common stock of Juniata Valley Financial Corporation, Fulton Bank, and PPL Electric Utilities; and undivided one-half interests of three (3) distinct parcels of real estate, referred to as the Residence, the Farm, and the Woodland[.]

4. [Appellant] over time sold the Fulton Bank stock, the PPL Electric Utilities stock, and some of the Juniata Valley stock, and the proceeds of those sales were deposited in interest-bearing certificates of deposit or a checking account for use in paying costs of the Trust and/or distribution of income or principal pursuant to the terms of the Trust.

5. [Appellant] did not inquire into what income was being produced from the Farm or the Woodland during the administration of the Trust.

6. [Appellant] received repeated requests from [Objector] Donald Graybill, his uncle and one of the three remaindermen of the Trust, in the period of 2000-2007 for advance distributions of principal for various reasons.

7. During the period [of] 2001-2003, [Appellant] received multiple communications from [Objector] Dianna Spriggle, his aunt and one of the Trust's remaindermen, regarding the Trust['s] terms and questioning the propriety or necessity for the Trust's existence.

8. On three (3) occasions over the 11-year period of [Appellant's] administration, Trust funds were used to pay costs associated with the real estate assets other than taxes and insurance.

9. No evidence was produced to show that [Appellant] actively managed the real estate assets or the securities portfolio.

10. At least for some tasks, [Appellant] used co-employees of First National Bank of Mifflintown, or paid the Bank or someone else to prepare tax returns for the Trust.

11. Prior to Florence [M.] Graybill's death on March 11, 2013, she incurred long-term care expenses of $8,615.00, and uninsured medical expenses of $614.47, which remain unpaid.

12. At the death of Clair [S.] Graybill, [a] no marital deduction trust ("Trust A") was created by [Appellant], there being insufficient assets for such trust to be necessary, and the provisions of Trust B included in Clair's Will were the effective provisions for the Trust administered by [Appellant].

13. Clair [S.] Graybill's Will, at Article IV(2)(b), gave [Appellant] discretion to use [the] principal of Trust B for Florence's support, welfare[,] and best interests without consideration of the other beneficiaries of the Trust.

14. Clair [S.] Graybill's Will, at Article VI(1)(c), provides for [Appellant] to be paid reasonable compensation for his services and to be reimbursed expenses.

15. No separate fee agreement was entered between Clair [S.] Graybill and [Appellant].

16. The value of the Trust principal as of May 30, 2002, was $250,732.35, book value, and $265,965.84, market value. Of that, the book value of the real estate was $145,890.20[.]

17. The value of the Trust principal as of July 31, 2013, was $181,012.54, book value, and $381,090.48, market value. Of that book value, $145,890.20 was the value of the real estate. Of that market value, $336,000.00 was the value of the real estate.

18. [Appellant] spent 347.75 hours of his time on Trust matters from May 30, 2002, to July 31, 2013, or an average of 1.3 hours per month over the 264-month period for which his compensation of $27,064.70 is claimed.

19. [Appellant] has extensive experience in trust and estate management and administration, and was the Trust Officer of First National Bank of Mifflintown at the time his grandfather's Will was made.

20. As of July 31, 2013, the Trust held $27,064.70 in cash, the interests in the real estate, and 737 shares of common stock of Juniata Valley Financial.

21. When asked by Cynthia Williams of Juniata Valley Bank in November[] 2012, whether the Trust had liquid assets to help pay Florence [M.] Graybill's nursing home costs, [Appellant]

did not answer the question, despite being told that Florence's liquid assets were being depleted by nursing home costs.

22. Objectors. . .incurred attorney's fees in this matter of $3,810.15.

Auditor's Report, filed 11/25/14, at 1-3.

In addition to the aforementioned findings of fact, noting the absence of a fee agreement governing Appellant's compensation and concluding the Will provided Appellant was entitled to "reasonable compensation," the auditor concluded Appellant's claimed compensation of $27,064.70 was unreasonable. In this regard, the auditor indicated the following:

Here, the value of the initial trust principal was modest, so much so that the credit trust was the only trust required to be administered. The three listed securities are exchange-listed securities requiring little or no effort to track. The undivided interests in the real estate could have justified an enhanced fee, had they been actively managed. They were not. Although the administrative difficulty of this trust was not high, because the marital deduction trust was not needed, the evidence does show that [Appellant] was required to respond to challenges by beneficiaries regarding trust terms, especially during the early years of his tenure as Trustee. [Appellant] exhibited some skill in negotiating a few issues during the trust administration. Success is harder to find in this scenario, there being no securities trading activity, no attempt to bolster income from the real estate, and rather feeble attempts to coordinate management with Florence [M. Graybill] or her representatives. Little if any risk was taken by [Appellant] in the management of the assets held in Trust. Finally, of the various fee schedules introduced by the parties at [a] hearing, none seem to provide for a full percentage point annual fee, as is claimed by [Appellant]. All provide for lower fees.

Another factor will be considered in evaluating a reasonable fee in this trust, and that is the family relationship between the testator and [Appellant]. The [a]uditor is of the opinion that the testator named his grandson as Trustee not only

because of the grandson's experience as a trust administrator, but also because he placed faith and trust in him as a grandson. The testator certainly was aware that [Appellant] was the Trust Officer with First National Bank of Mifflintown, and yet Clair [S.] Graybill did not name the Bank as Trustee, he named his grandson,[Appellant], as Trustee. The [a]uditor believes that a tacit assumption was made by the testator that his grandson would perform the same services at a lower cost than the Bank would charge.

*Id.* at 4-5.

Having concluded Appellant's claimed compensation amount was unreasonable, the auditor reviewed the relevant factors and concluded $15,583.47 was "reasonable compensation" for Appellant. In this regard, the auditor indicated the following:

No doubt exists that [Appellant] did provide services to the Trust in its administration, some of which were beyond the ordinary administrative tasks in a trust setting. On the other hand, the *laissez faire* approach to the real estate did not serve the interests of the primary income beneficiary.

[Appellant] has suggested that, now that his compensation is at issue, its calculation should be based primarily on a percentage basis, using the fair market value of the assets, rather than the book value. The [a]uditor will not fully adopt that approach, primarily because the current real estate appraisals (commissioned after the objections to [Appellant's] compensation had been pending for more than six months) are of questionable relevance to the value of the real estate over the eleven (11) years plus trust administration. Because the "book value" of the real estate interests was established by the date of death value used in the Clair S. Graybill estate administration, the [a]uditor will use those value in calculating trust fees, absent any other relevant and contemporaneous value over the life of the trust administration.

For the years 2003, 2005, 2006[,] and 2007, the [a]uditor finds that reasonable Trustee compensation is 1% of the fair market value of the Trust assets, not including the real estate

interests. For the years 2002, 2004, 2008, 2009, 2010, 2011, 2012, and the first seven (7) months of 2013, the [a]uditor finds that reasonable Trustee compensation is .6% of the fair market value of the Trust assets, not including the real estate interest. For the administration of the real estate interests, the [a]uditor finds that reasonable Trust compensation for the entire period of May 31, 2002, to July 31, 2013 is 5% of the book value of the real estate interests. Consequently, the [a]uditor finds reasonable compensation for [Appellant] for the period of May 31, 2002, to July 31, 2013, is $15,583.47. The auditor acknowledges that even this fee, at over eight (8%) percent of the value of the trust principal, could arguably be viewed as on the high side, but feels it is reasonable in these circumstances.

*Id.* at 5.

The auditor additionally addressed the fact that Appellant did not pay the nursing home, pre-death uninsured, and unpaid medical expenses for Florence M. Graybill, who was the sole income beneficiary of the Trust prior to her death. The auditor concluded Appellant should have paid the expenses, which totaled $9,229.47. *Id.* at 6. Moreover, the auditor concluded Objectors, who sought attorneys' fees, were entitled to such fees from the Trust since "the objection to [Appellant's compensation] resulted in added value to the Trust beneficiaries[.]" *Id.* Finally, the auditor concluded "[a]udit costs and fees are the liability of the trust, unless a basis exists for shifting that liability to [Appellant] or the remaindermen. No such basis has been argued in this proceeding, and therefore the Trust shall bear the costs and fees of the audit." *Id.*

By decree entered on November 25, 2014, the Orphans' Court adopted the auditor's report, and thereafter, Appellant filed timely exceptions.

Following a hearing, by order and opinion entered on August 27, 2015, the Orphans' Court denied Appellant's exceptions and confirmed the auditor's report. Appellant filed a timely notice of appeal.[2]

Appellant's first contention is the Orphans' Court erred in concluding Appellant's requested compensation was unreasonable and in calculating Appellant's compensation at a lower rate. Specifically, Appellant contends that, while the Orphans' Court cites "the correct factors to consider when determining reasonableness of compensation[,] [it] erred when looking beyond the four corners of the documents, considering factors not supported by law." Appellant's Brief at 15. In this vein, Appellant argues the following: (1) The Orphans' Court erred in failing to consider that, despite his "extraordinary efforts," Appellant was unable to properly manage the property due to the noncooperation of Florence M. Graybill. *Id.* at 18; (2) The Orphans' Court erred in considering the family relationship between Clair S. Graybill and Appellant. *Id.* at 19-20; (3) The Orphans' Court erred in adopting the auditor's factual finding and analysis regarding Appellant's use of his Bank co-employees in performing his services under the Trust. *Id.* at 21; (4) The Orphans' Court erred in failing to consider the extent of

---

[2] The Orphans' Court directed Appellant to file a Pa.R.A.P. 1925(b) statement, and Appellant properly complied. The Orphans' Court did not file a responsive Pa.R.A.P. 1925(a) opinion; however, on August 27, 2015, in denying Appellant's exceptions, the Orphans' Court filed a comprehensive opinion, which addresses the issues presented on appeal.

Appellant's involvement with the management of the Trust, including filing annual formal accounts with the court and providing monthly informal accounts to the Trust beneficiary, Florence M. Graybill. *Id.* at 23; (5) The Orphans' Court erred in failing to consider Appellant has specialized skill and expertise, which should be properly compensated. *Id.* at 23-24; and (6) The Orphans' Court erred in failing to acknowledge that "[m]arket rates for a corporate fiduciary of similar skill and experience as Appellant would be in excess of what Appellant sought as compensation for his services in the management of the Trust." *Id.* at 24.

Our standard of review for decisions of the Orphans' Court is well settled. "We will modify a decree [or order] only if it is not supported by competent or adequate evidence, if an error of law has been committed, or if the [Orphans' Court] abused its discretion or capriciously disbelieved credible or competent evidence." *In re Sweeney*, 695 A.2d 426, 428 (Pa.Super. 1997) (quotation omitted).

Here, there is no dispute that the parties did not have a specified fee agreement, but that Appellant's grandfather's Will provided Appellant is entitled to "reasonable compensation" for his management of the Trust.

20 Pa.C.S.A. § 7768, pertaining to the compensation of a trustee, provides, in relevant part, the following:

> **(d) Court authority.--**In determining reasonable compensation, the court may consider, *among other facts*, the market value of the trust and may determine compensation as a fixed or graduated percentage of the trust's market value. The

- 9 -

court may allow compensation from principal, income or both and determine the frequency with which compensation may be collected. Compensation at levels that arise in a competitive market shall be presumed to be reasonable in the absence of compelling evidence to the contrary.

20 Pa.C.S.A. § 7768(d) (italics added) (bold in original).

This Court has noted that the determination of proper compensation is a "matter peculiarly within the knowledge, competence, and experience" of the Orphans' Court. *In re Raymond G. Perelman Charitable Remainder Unitrust*, 113 A.3d 296, 308-09 (Pa.Super. 2015) (quotation marks and quotation omitted). *See In re Estate of Sonovick*, 541 A.2d 374, 376 (Pa.Super. 1988) (indicating the determination of whether compensation claimed by a fiduciary is "reasonable and just" is left to the sound discretion of the trial court). Moreover, the trustee has the burden of proving the services rendered to establish the amount claimed is "reasonable compensation." *In re Smith*, 874 A.2d 131 (Pa.Super. 2005) (*en banc*). Further, "[i]t is well established that an orphans' court, in certain situations, can reduce the fees of. . . a trustee to a level that it determines is 'reasonable and just compensation.'" *In re Adoption of M.M.H.*, 981 A.2d 261, 273 (Pa.Super. 2009) (quotation marks and quotations omitted).

In the case *sub judice*, in explaining the reasons it confirmed the auditor's calculation of the "reasonable compensation" in connection with Appellant's services as the Trustee, the Orphans' Court relevantly provided as follows:

[Appellant] first argues that the [a]uditor erred in determining [Appellant's] compensation of $27,064.70 was unreasonable.

\*\*\*

The [a]uditor acknowledged in his report that the Will creating the Trust. . .dictate[s] that reasonable compensation be paid to [Appellant] for his services. The [a]uditor further cited several factors to be considered in his determination of what constitutes reasonable compensation in this case including the value and character of the trust property, the extent of risks undertaken by [Appellant], the degree of administrative difficulty, the skill and success of administering the trust[,] and statutorily approved rates of reasonable compensation. The [a]uditor clearly explained his reasoning for lowering [Appellant's] compensation by analyzing each of these factors. He distinguished the separate assets of the trust: three exchange-listed securities that require little or no effort to track and the undivided interests in real estate, which were not actively managed by [Appellant]. The [a]uditor acknowledged the need for [Appellant] to communicate more frequently than usual with beneficiaries challenging the terms of the trust. He also noted [Appellant's] negotiation of a few issues through the administration of the trust. However, the [a]uditor noted [] there is no securities trading activity and no attempt to foster income from the real estate. Thus, the [a]uditor found that little risk was taken by [Appellant] while managing these assets and concluded that [Appellant's] [requested] compensation was unreasonable.

Objectors argue in support of the [a]uditor's findings, claiming compensation must be based on services actually performed by [Appellant], not an arbitrary formula. They suggest Attorney Clyde Bomgardner[,] as well as Rhoads and Sinon, LLP, assisted [Appellant] in his administration of the trust from 2002-2004. In addition, Objectors claim First National Bank of Mifflintown and Monroe Tax Associates prepared the annual Trust Income Tax Returns for several years. They also note Renee Williams, an assistant trust officer at First National, was paid for her administrative services for the trust. Finally, Objectors contend that [Appellant's] secretary[,] Sandra Holman, typed the monthly asset inventory and transaction

history provided to Daniel Clark, Florence [M.] Graybill's attorney.[3]

[Appellant] testified that he did not perform any duties for the Graybill trust during his regular work hours as Vice President of First National Bank of Mifflintown. Evidence was also presented that other Bank employees were asked to complete some tasks for the Trust. However, it is unclear if these employees were acting outside of their regular schedule. This evidence contradicts [Appellant's] assertion that all trust business, including his own, was conducted outside First National Bank of Mifflintown's business hours. If [Appellant] was this particular about separating his own work hours from the hours he spent personally administering to the trust, it seems he would have also been personally communicating this information to his staff as well. It is notable that Ms. Hoffman did not receive compensation for any duties she performed for the Graybill Trust outside of her regular work hours.

In addition, the [a]uditor perceived little effort by [Appellant] in attempting to communicate with Florence [M.] Graybill and her representatives. Evidence on the record strongly corroborates the [a]uditor's assessment that [Appellant] also participated in withholding information[,] as well as funds[,] from Florence [M.] Graybill and her representatives. Thus, it is difficult to see why [Appellant] should receive further compensation when he contributed to the miscommunication and delay in care, necessitating superfluous reports.

The [a]uditor also explained his reasoning for arriving at the lower rate of [$]15,583.47. The [a]uditor felt that despite [Appellant's] services to the trust, his actions did not serve the

---

[3] During the entire administration of the Trust, Appellant was employed by the First National Bank of Mifflintown as a trust officer, and he utilized various co-employees to perform tasks for the trust. For example, the evidence revealed that Appellant had a Bank employee notarize documents for him; in 2007, Appellant paid the Bank $100.00 for the Trust's income tax preparation; in 2006 and 2007, Appellant paid Renee Williams, an assistant trust officer, $65.00 for administrative services for the Trust; and from 2003 to 2004, his secretary typed monthly asset inventory and transaction histories for him. N.T., 10/15/14, at 123, 124-26, 165-66.

interests of the primary income beneficiary. He further noted that [Appellant] wished to base the calculations on a percentage of the fair market value of the assets, however he partially declined to adopt that approach, stating that current real estate appraisals are of questionable relevance to the value of the property during the eleven-year administration of the trust. [Appellant] takes issue with this. . ., arguing that he is being punished for choosing not to have yearly property appraisals completed in an effort to conserve trust funds. While the lack of appraisals may or may not unfavorably influence the calculation of [Appellant's] compensation, the fact still remains that no appraisals were completed during the trust's eleven-year tenure. Having no values calculated from the relevant time frames, and upon finding the value of an appraisal completed six months after objections were raised to be irrelevant, it is reasonable to conclude that compensation should be calculated by the book value of the real estate assets. This value was determined at the time of the administration of Clair [S.] Graybill's Estate and are based on values at the date of [his] death. Thus, the [a]uditor concluded that [Appellant] is entitled to 5% of the book value of the real estate assets from 2002-2013.

The [a]uditor calculated [Appellant's] fee for all other assets based on the fair market value of those assets. For years 2003, 2005, 2006, and 2007, [Appellant's] compensation was calculated at 1% of the fair market value of the Trust assets not including real estate. For years 2002, 2004, 2008, 2009, 2010, 2011, 2012, and 2013, the [a]uditor assessed [Appellant's] fee at .6% of the fair market value of all assets excluding real estate.

Finally, the [a]uditor acknowledged that the reduced fee of $15,583.47 is over eight (8%) percent of the value of the trust principal and such a fee can still be considered excessive. Despite this, the [a]uditor felt this compensation was reasonable based on the evidence presented regarding [Appellant's] administration of the Trust.

Orphans' Court Opinion, filed 8/27/15, at 1-3 (footnote added).

As indicated *supra*, 20 Pa.C.S.A. § 7768(d) does not provide an exhaustive list of factors, which the court should consider in determining

what constitutes "reasonable compensation." In this case, we find no abuse of discretion and conclude the Orphans' Court has adequately explained the reasons for adopting the auditor's findings of fact and calculations. *See In re Sweeney*, *supra*.

Appellant's second contention is the Orphans' Court erred in holding Appellant should have paid Florence M. Graybill's nursing home, pre-death uninsured, and unpaid medical expenses from the Trust. Appellant contends the Will and Trust instrument gave him sole discretion whether to pay for Florence M. Graybill's support and welfare from the Trust. Appellant's Brief at 28-29. He further asserts the Will provisions make it clear that Clair S. Graybill did not intend to pay for Florence M. Graybill's estate expenses from the Trust, and the Orphans' Court erred in holding to the contrary. *Id.* at 28-30.

In addressing Appellant's issue, the Orphans' Court explained as follows:

> The [Will] of Clair S. Graybill gives [Appellant] discretion to pay certain sums to his wife, Florence [M.] Graybill, "as the Trustee from time to time determines to be required or desirable for her support[,] welfare[,] and best interests." The [W]ill goes on to state, "The [T]rustee need not consider the interests of any other beneficiaries in making distributions to [Florence M. Graybill] or for her benefit." Florence [M.] Graybill died on March 11, 2013. Her medical bills obviously pre-date her death. After review[,] the Court [finds] [Appellant] provided no explanation at the [a]uditor's [h]earing for not paying the nursing home expenses and other pre-death medical bills. [Appellant's] actions are particularly inexplicable when emails between him[], Cynthia Williams, Vice President and Trust Officer of Juniata Valley Bank, reflect it was common practice of

- 14 -

the Trust to pay such expenses when Florence [M.] Graybill's income was depleted.

Orphans' Court Opinion, filed 8/27/15, at 3.

We find no abuse of discretion in this regard. ***In re Sweeney***, ***supra***. Moreover, we note the Will provides that Clair S. Graybill's "primary concern is for the support, welfare[,] and best interest of my wife[, Florence M. Graybill]." ***See*** Clair S. Graybill Will, dated 6/9/00, at 3. Accordingly, the Orphans' Court did not err in concluding Appellant should have paid the expenses at issue from the Trust.

In his final contention, Appellant avers the Orphans' Court erred in awarding auditor's fees and attorneys' fees to Objectors. Specifically, Appellant initially contends "[t]he Orphans' Court erroneously affirmed the [a]uditor's [r]eport, holding that Objectors' actions were not meritless, therefore the reasoning for granting attorney[s'] fees and auditor['s] fees is no longer applicable and should be reversed by this Honorable Court." Appellant's Brief at 32. Alternatively, with regard to the award of attorneys' fees, Appellant argues the Orphans' Court erred by awarding such fees under the common fund doctrine since no individual was unjustly enriched by the litigation at issue. ***Id.*** at 33.

As to Appellant's argument the award of attorneys' fees and auditor's fees was improper since the Orphans' Court should not have confirmed the auditor's report, we find no merit to this argument and decline to address it further in light of our analysis *supra*.

As to Appellant's argument the Orphans' Court erred in awarding attorneys' fees to Objectors under the common fund doctrine, we disagree.

As this Court has previously recognized:

> We begin by noting that "a litigant cannot recover counsel fees from an adverse party unless there is express statutory authorization, a clear agreement of the parties, or some other established exception." **Gall v. Crawford**, 982 A.2d 541[, 549] (Pa.Super. 2009) (citing **Trizechahn Gateway LLC v. Titus**, 601 Pa. 637, 976 A.2d 474, 482 (2009)). Moreover, "[t]he applicant for counsel fees has the burden of proving his/her entitlement thereto." **Id.**
>
> ***
>
> It is the American rule that parties to adversary litigation are required to pay their own counsel fees. The common fund doctrine, a common law exception to this rule, has been statutorily codified at [42 Pa.C.S.A.] § 2503[(8)]. **Jones v. Muir**, 511 Pa. 535, 515 A.2d 855 (1986). In essence, the common fund doctrine applies when an attorney's services: protect a common fund for administration or distribution under the direction of the court, or where such fund has been raised for like purpose, it [the fund] is liable for costs and expenses, including counsel fees incurred. This is the case even though the protection given or the raising of a fund results from what may be properly termed adversary litigation. **Hempstead v. Meadville Theological School**, 286 Pa. 493, 134 A. 103 (1926).
>
> In other words, when several people have a common interest in a fund, the assets of which may be created through adversary litigation, and one or more of these people, for the benefit of all, but at their own cost and expense, bring suit to administer or preserve that fund, the court will order plaintiff or plaintiffs to be reimbursed for costs and expenses, including counsel fees, from the property of the fund, or order those benefited to contribute proportionately toward that expense.
>
> Furthermore, 42 Pa.C.S.[A.] § 2503(8) authorizes the award of attorneys' fees to "[a]ny participant who is awarded counsel fees out of a fund within the jurisdiction of the court pursuant to any general rule relating to an award of counsel fees

from a fund within the jurisdiction of the court." This authorization has been taken to mean that the common fund exception applies not only when the fund is before the court prior to litigation, but where the successful litigation of the underlying suit resulted in a substantial benefit to a "group of others in the same manner as plaintiff[.]"

***Petow v. Warehime***, 996 A.2d 1083, 1087-88 (Pa.Super. 2010) (citation and quotations omitted). ***See Couy v. Nardei Enterprises***, 587 A.2d 345, 347 (Pa.Super. 1991) ("[T]he common fund exception. . .rests on the perception that persons who obtained the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense[.]") (citation omitted)).

In the case *sub judice*, the Orphans' Court found that, following Florence M. Graybill's death, there were three remaining beneficiaries to the Trust; namely, the two Objectors, who incurred attorneys' fees with regard to the instant litigation, and Appellant's father, Dale Graybill, who did not participate in the litigation or, consequently, incur attorneys' fees. However, as the Orphans' Court aptly concluded, "all beneficiaries, including[] Dale Graybill, will benefit from [the] reduction in [Appellant's] compensation." Orphans' Court Opinion, filed 8/27/15, at 3. Accordingly, the Orphans' Court directed the Objectors be paid their attorneys' fees from the Trust. We agree with the Orphans' Court's sound reasoning in this regard. ***See Petow***, ***supra***; ***Couy***, ***supra***.

For all of the aforementioned reasons, we affirm.

Affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>6/10/2016</u>